IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

DAVID LEE SPICER,                    )        Civil Action No. 3:12-460-TLW-JRM
                                     )
                    Plaintiff,       )
                                     )
        v.                           )
                                     )      **REPORT AND RECOMMENDATION**
CAROLYN W. COLVIN,[1] ACTING         )
COMMISSIONER OF                      )
SOCIAL SECURITY,                     )
                                     )
                    Defendant.       )
_____)

        This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et

seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this

action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision

of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental

Security Income ("SSI").

## ADMINISTRATIVE PROCEEDINGS

        Plaintiff filed an application for SSI on May 29, 2009 (protective filing date), alleging

disability as of May 1, 2008.[2] Tr. 11, 132. Plaintiff's claim was denied initially and upon

reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  A

hearing was held on May 7, 2010, at which Plaintiff, and a vocational expert ("VE") appeared and

_____

        [1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be
substituted for Michael J. Astrue as Defendant in this lawsuit.

        [2]Plaintiff filed a prior application for SSI in August 2008, alleging disability beginning in
June 2007.  He did not pursue his claim and it was denied in November 2008.  See Tr. 82-85, 126-
129.

testified. Tr. 34-78.  On August 13, 2010, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled because work existed in the national economy which Plaintiff could perform.

Plaintiff was forty years old at the time of the ALJ's decision. He has a ninth grade education and past relevant work as a security worker, sander, and pest control worker. See Tr. 27, 41. Plaintiff alleges disability due to back and leg pain, heart attacks, coronary artery disease with stent placement, and mental impairments including manic bipolar and depression. See Tr. 159.

The ALJ found (Tr. 13-28):

1. The claimant has not engaged in substantial gainful activity since May 29, 2009, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: coronary artery disease and degenerative disc disease and joint disease of the spine. (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with certain additional limitations. Specifically, the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit, stand, and walk for 6 hours each out of an 8-hour workday. The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally kneel, crawl, crouch, stoop, balance, and climb ramps and stairs. The claimant must avoid concentrated exposure to temperature extremes.

5. The claimant is capable of performing past relevant work as a security worker, sander, and pest control worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 416.965).

6.    The claimant has not been under a disability, as defined in the Social Security Act, since May 29, 2009, the date the application was filed (20 CFR 416.920(f)).

The Appeals Council denied the request for review in a decision issued December 20, 2011 (Tr. 1-3), and the ALJ's decision became the final decision of the Commissioner. Plaintiff filed this action in the United States District Court on February 17, 2012.

## STANDARD OF REVIEW

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

## MEDICAL EVIDENCE

On June 29, 2007, Plaintiff was seen at the Greenville Memorial Hospital ("GMH") for syncope and chest pain. He was admitted on June 30, 2007, and underwent a heart catheterization on July 2, 2007. His heart ejection fraction rate was noted to be low normal at 50 to 55.[3] Plaintiff

_____

[3]Ejection fraction is:
the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole; it is the stroke volume divided by the end-diastolic volume, often expressed as a percentage. It is normally 65 [plus or minus] 8 percent; lower values indicate ventricular dysfunction.
Dorland's Illustrated Medical Dictionary, 740 (32nd ed. 2012).

3

was assessed with severe premature coronary disease with non-ST elevation myocardial infarction, syncope associated with ACS, and hyperlipidemia. Plaintiff was discharged on July 4, 2007. Tr. 310, 312, 334, 337-338.  Plaintiff was seen by Dr. Thomas Siachos, a cardiologist, for a follow-up to his stent placement on July 30, 2007.  Dr. Siachos noted that Plaintiff was doing fairly well and had reported that he (Plaintiff) had one episode of chest pain that responded to nitroglycerin.   Dr. Siachos noted that Plaintiff was still smoking, but had cut back to a pack a day. Tr. 609. On August 27, 2007, Dr. Siachos noted that Plaintiff complained of diffuse muscle aches, denied any anginal chest pain, and was tolerating his medications. He stated he would prescribe Chantix if Plaintiff was unable to quit smoking. Tr. 599-600.

On September 5, 2007, Plaintiff was admitted to the hospital in Easley, South Carolina with right arm and chest pain. A chest x-ray showed that Plaintiff had clear and well-expanded lungs, normal heart size, and no plural effusions.  Plaintiff was discharged on September 6, 2007, with diagnoses of musculoskeletal chest pain, atherosclerotic coronary artery disease, and tobacco abuse. Hospital notes show that Plaintiff had been non-compliant with some of his medications and continued to smoke. Tr. 287, 592.

Plaintiff was admitted to GMH from January 9, 2008 to January 28, 2008 with a diagnosis of bipolar disorder with anxiety, and polysubstance dependence.  Plaintiff was treated with Tegretol for mood swings and temper.  It was noted that Plaintiff had a severely depressed mood, mood swings, and impaired concentration. Tr. 260-269.   His GAF at admission was noted to be 30, with his highest GAF in the past year estimated at 60-65.[4] Tr. 268.

---

[4]The GAF contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning, generally for the level of functioning
(continued...)

4

Plaintiff was treated for chest pain and bursitis of his right scapula at Cannon Memorial Hospital ("CMH") on April 17, 2008. Tr. 625. On May 5, 2008, Plaintiff was treated at the CMH emergency room for an insect bite on his leg. Tr. 618-622. Plaintiff was admitted to the Easley Hospital on June 10, 2008. He was later transferred to GMH for unstable angina and a cardiology evaluation. Tr. 291. Plaintiff complained of chest pain that radiated to his left arm. Doctors noted that Plaintiff continued to smoke cigarettes, and also smoked marijuana occasionally. Chest x-rays showed no active cardiopulmonary disease, and an echocardiogram ("EKG") was unchanged from prior EKGs. Doctors performed another left heart catheterization which revealed mild to moderate diffuse non-obstructive coronary artery disease with preserved left ventricular function. Continued medical therapy was recommended. Tr. 288-298, 543-584, 683-714, 830-839.

At the CMH emergency room in July 2008, Plaintiff complained of low back and leg pain, but denied any injury. Doctors noted mild tenderness, and prescribed narcotic pain medication and a muscle relaxant. Tr. 611-617, 964-967.

In September 2008, state agency physician Dr. Carl Anderson reviewed Plaintiff's medical records and opined that he could perform medium work with no concentrated exposure to heat or cold. Tr. 635-642. In October 2008, state agency psychologist Robbie Ronin reviewed Plaintiff's medical records and opined that Plaintiff had depression, anxiety, and substance abuse disorders, but

---

[4](...continued)
at the time of evaluation. A GAF score between 21 and 30 may reflect that "behavior is considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment." A score of 31 to 40 indicates some impairment in reality testing or communication or "major impairments in several areas," 41 to 50 indicates "serious symptoms" or "serious difficulty in social or occupational functioning," 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning," and 61 and 70 reflects "mild symptoms" or "some difficulty in social, occupational, or school functioning ." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

his mental health limitations did not produce any functional limitations and were, therefore, non-severe. Tr. 715-728.

On October 2, 2008, Plaintiff went to the emergency room and complained of dizziness, nausea, and chest pain. An exercise stress test was normal, and an EKG showed mild mitral regurgitation, but was otherwise normal. Tr. 646-649, 840-841.

On November 25, 2008, Plaintiff complained of chest pain. Doctors at the CMH emergency room noted that Plaintiff's EKG, chest x-ray, and lab results were "unremarkable." Tr. 952-954. Throughout 2007 and 2008 Plaintiff presented to the emergency room for various complaints, including a thumb nail tear (Tr. 299-307, 430-435), back and ear pain (Tr. 271-275), and ankle pain (Tr. 535-542).

On January 14 and 15, 2009, Plaintiff was treated two times in the emergency room following a car accident for complaints of neck and back pain and headaches. A CT scan of his head showed no evidence of acute abnormality; a CT scan of his cervical spine (which produced an incomplete visualization) showed mild degenerative changes, but no acute abnormality. Plaintiff was diagnosed with an acute cervical muscle spasm. Anxiety and narcotic pain medications were prescribed. Tr. 932-951, 1299-1300, 1419-1434. A few days later, Plaintiff returned to the emergency room, again complaining of low back pain and a headache. An x-ray of his spine showed no evidence of a bone injury but some degenerative narrowing of his disc spaces. Doctors prescribed him pain medication and a muscle relaxant. Tr. 926-931, 1411-1418.

Plaintiff established care at the Oaktree Medical Center ("Oaktree") on January 29, 2009. Plaintiff's x-rays were noted to be normal. Doctors noted some tenderness in Plaintiff's neck and

6

back and a moderately reduced range of motion. Pain medications and a muscle relaxant were prescribed and Plaintiff was referred to a chiropractor. Tr. 968-970.

On February 9, 2009, Plaintiff went to a chiropractor at the Oaktree, who noted muscle spasms, decreased cervical range of motion, a positive straight leg raise test, and lumbar spine pain on movement. The chiropractor also noted that MRIs of Plaintiff's spine were normal. Tr. 971-972. Plaintiff returned later in February to Oaktree complaining of neck and back pain. Doctors noted that he missed his last five physical therapy sessions due to bronchitis, but continued to smoke one pack of cigarettes per day. An examination revealed tenderness in Plaintiff's spine and positive straight leg raise test on his right leg, muscle relaxants were prescribed, and bilateral SI joint injections were administered. Tr. 973-975, 1337.

In early March 2009, Plaintiff returned to Oaktree for low back and leg pain. Doctors noted that electomyography ("EMG") and reflex tests were normal. Tr. 977-979. A few days later, Plaintiff went to the emergency room and complained of severe back pain, which began after he said he bent over and picked up something. Doctors prescribed narcotic pain medication, an anti-inflammatory, and a muscle relaxant. Tr. 913-917.  Later that month, doctors at Oaktree noted that Plaintiff's neck was improved, but his back and neck were still tender with spasms. Doctors prescribed pain medication, anxiety medication, and a muscle relaxant. Tr. 980-82.  An MRI of his lumbar spine showed some spondylosis similar to a January 2008 study. Tr. 1301-1302.

Plaintiff returned to Oaktree on April 8, 2009. Dr. Rico Aragon opined that Plaintiff's neck and shoulders were doing well.  He noted that Plaintiff had low back tenderness with spasms, positive straight leg raising on the left, and negative straight leg raising on the right. Tr. 983-985. On April 27, 2009, Dr. Aragon assessed Plaintiff with lumbar radiculopathy, prescribed a muscle

relaxant and a narcotic pain medication, and informed Plaintiff that he would need to be seen by a chronic pain clinic if he required more narcotic pain medication. Tr. 986-988.

On April 21, 2009, Plaintiff was treated at the emergency room for complaints of chest pain and shortness of breath. Doctors noted that Plaintiff smoked regularly, and a chest x-ray was normal. Plaintiff was admitted, heart catheterization with stenting of his proximal right coronary artery was performed, and  he was noted to be stable from a cardiac standpoint at the time of his discharge (April 23, 2009). Tr. 733-737, 785, 795-829, 842-843.

Plaintiff began seeing Dr. Jay Patel of Pain Management Specialists in May 2009. Dr. Patel noted that the MRI of Plaintiff's lumbar spine showed moderate degenerative changes and some narrowing, and that Plaintiff had generalized tenderness in his lumbar spine. Dr. Patel wrote that Plaintiff could not stop taking Plavix (due to his recent stenting) and therefore he could not give Plaintiff steroid injections; prescribed a narcotic pain medication, a muscle relaxant, and an anti-inflammatory; and discussed with Plaintiff the need for a consultation about possible surgery. Tr. 989-994.  On May 19, 2009, Plaintiff saw a cardiologist who advised him to continue taking aspirin and Plavix, and to seek mental health assistance. Tr. 850-851.

Plaintiff returned to the emergency room on May 25, 2009 for non-cardiac chest, abdominal, and arm pain. Doctors noted that he continued to smoke, an EKG was normal, and an x-ray of Plaintiff's shoulder was normal. It was noted that although Plaintiff claimed he was taking his medicine, he had been less than fully compliant in the past. Plaintiff's right shoulder was assessed to be normal. Thirty narcotic pain pills were prescribed, with the notation that Plaintiff had an "apparent dependence on narcotics." Tr. 739, 762-764, 852-858. Cardiac catheterization was performed on May 26, 2009. The impression was "continued satisfactory result of multivessel

8

stenting[,] but with diffuse low-grade to moderate irregularity throughout the three coronary systems." Tr. 855. Plaintiff was discharged on May 27, 2009. Tr. 856.

In June 2009, Dr. Patel prescribed a muscle relaxant and a sleep aid. Tr. 995-996. At an emergency room visit for chest congestion and cough on June 19, 2009, an EKG and chest x-ray were normal. Tr. 875-879. On June 22, 2009, Plaintiff went to the emergency room again, this time stating he had been assaulted and had back, neck and eye pain. X-rays revealed no evidence of facial bone fracture. Tr. 729-732.

On June 29, 2009, Plaintiff returned to the emergency room and complained of low back and leg pain, which started the day after he had tried to lift something. Tr. 870-874. On July 5, 2009, Plaintiff went to the emergency room and said he had abdominal and chest pain. Doctors recommended a low-fat diet and that he stop smoking. Tr. 859-869. Later that month, Plaintiff also saw Dr. Patel. Tr. 1305-1308. On July 29, 2009 Plaintiff went to the emergency room again for chest pain. Tr. 1098-1100. Also in July 2009, Dr. Aragon (of Oaktree) completed a form indicating that Plaintiff did not have any mental diagnoses; was oriented; had intact thought process and appropriate thought content; had normal mood and affect; had good attention, concentration, and memory; and did not have any work-related mental limitations. Tr. 997.

On August 13, 2009, Plaintiff saw Dr. Patel for refills on his pain medications. Tr. 1024-1025. On August 20, 2009, Dr. Patel noted Plaintiff told the front desk that his dog ate all of his Lortab pills and he had to shoot his dog, but told other staff members that his dog ate only some of his Lortab and his dog died as a result. Dr. Patel refused to give him a prescription for more Lortab. He noted that Plaintiff got angry, said he was going to the emergency room where he could get pain medications, asked to be discharged, and asked to have his records faxed to his attorney. Tr. 1020.

The same day, Plaintiff went to the emergency room complaining of back pain and stated that his dog ate his Lortab and requested a refill. Doctors prescribed him two other pain medications. Tr. 1135-1139. Plaintiff went to the emergency room on August 27, 2009 complaining of back, neck, and leg pain after jumping off a lawn mower (back x-rays showed no evidence of injury but some degenerative changes). Tr. 1090-1097.  Plaintiff went again to the emergency room on August 31, 2009, complaining of chest pain. A chest x-ray showed normal findings. Tr. 1079-1089.

On August 20, 2009, state agency physician Dr. Dale Van Slooten reviewed Plaintiff's medical records and opined that Plaintiff could perform a range of light work that involved frequently kneeling and crawling; occasionally climbing ramps and stairs, balancing, stooping, and crouching; never climbing ladders, ropes, or scaffolds; and avoiding exposure to extreme temperatures. Tr. 1012-1019. The same month, state agency psychologist Dr. Debra Price opined that Plaintiff had only non-severe mental limitations that did not cause significant functional limitations. Tr. 998-1011.

On September 3, 2009, Plaintiff returned to the emergency room and complained of chest pain. Doctors noted that he still smoked cigarettes, stress tests showed blood flow within normal limits, and an abdominal ultrasound was normal. Tr. 1118-1134 . Plaintiff went to the emergency room four more times that month complaining of chest pain (Tr. 1028-1049, 1395-1410); shortness of breath (chest x-rays showed prominent left hilum and a CT was recommended)(Tr. 1072-1078); a knot on his groin and leg pain (ultrasounds were normal)(Tr. 1066-1071); and back and leg pain (lumbar spine x-rays were normal despite degenerative changes) for which muscle relaxants were prescribed (Tr. 1111-1117).

On September 4, 2009, state agency physician Dr. William Hopkins reviewed Plaintiff's medical records and affirmed Dr. Van. Slooten's assessment that Plaintiff could perform a range of light work. Tr. 1027.  State agency psychologist Xanthia Harkness also reviewed Plaintiff's records and affirmed Dr. Price's opinion that Plaintiff's mental limitations were non-severe. Tr. 1026.

In October 2009, Plaintiff went to the emergency room four times. On one occasion he complained of low back pain and leg numbness that began after he hurt his back while moving a refrigerator. Doctors noted some tenderness, and prescribed him pain medication and a muscle relaxant. Tr. 1061-1065. On two visits he complained of chest pain, but an EKG was normal and a chest x-ray showed no acute changes. Tr. 1050-1060, 1291-1298.  Another time he complained of back pain, vomiting, and diarrhea, and was prescribed more pain medications. Tr. 1106-1110, 1219-1222.

In November 2009, Plaintiff went to the emergency room three times. On one occasion, narcotic pain medications were prescribed for a back sprain. Tr. 1285-1290.  On another occasion, doctors noted a normal exam (active and full range of motion, no tenderness, normal gait, and full muscle strength in all extremities) despite some tenderness and limited motion in his thoracic spine. Tr. 1278-1284. During a visit for chest pain, x-rays were noted to be normal. Tr. 1270-1277.

In December 2009, Plaintiff returned to the emergency room six times. He went once for back pain following a lifting injury at home and was prescribed pain medications. Tr. 1215-1218. Plaintiff went another time for bronchitis, but a chest x-ray was normal. Tr. 1261-1269. The four other times were for chest pain.  At these visits, chest x-rays showed no evidence of acute cardiopulmonary disease and stress tests showed some reversible restriction in blood flow to tissues (ischemia) and

11

normal blood flow. Doctors performed another stenting procedure (of the left circumflex). Tr. 1140-1181, 1239-1259, 1383-1394.

In January 2010, Plaintiff went to the emergency room four times, once for abdominal pain (Tr. 1233-1238), twice for chest pain (chest x-rays at these visits were normal)(Tr. 1182-1194), and once for nausea (a chest x-ray was again normal)(Tr. 1224-1232). Plaintiff did not go to the emergency room in February 2010, but returned twice in March 2010, once for chest pain (chest x-rays were normal) (Tr. 1374-1379) and once for back pain after he claimed a refrigerator fell on him (x-rays showed no evidence of any injury and that his lumbar disc degeneration was unchanged from September 2009)(Tr. 1368-1373).

On April 21, 2010 Plaintiff was admitted to the hospital for chest pain. A left heart catheterization revealed moderate non-critical coronary artery disease, patent stents, and normal left ventricular function. The plan was for medical management. Tr. 136-1367.

## **HEARING TESTIMONY**

At the hearing on May 7, 2010, Plaintiff testified he could not work because he had breathing problems, coronary artery disease, back and leg pain, and depression and anxiety. Tr. 48-49. Plaintiff stated he had five stents in his heart. Tr. 49. He testified he got out of breath easily and could only walk about fifty feet. He also said he could not sit or stand for very long or his back and legs started hurting. He said he needed to lie down throughout the day. Tr. 50-52. Plaintiff testified that he still smoked ten to twelve cigarettes per day which was down from the sixty cigarettes per day he smoked in the past, and that he was unable to quit. Tr. 55-56. Plaintiff stated that he had smoked marijuana twice a week to help him sleep, but denied he had ever used any other illegal drugs. Tr. 56, 63, 69.

He could not explain why his medical records indicated that he had used methamphetamines (and other drugs). Tr. 69.

Plaintiff testified that he did not do any activities. Tr. 54. He said he prepared simple meals, but denied doing any other type of cleaning, household chores, or yard work. Tr. 54-55, 65-67. He said he grocery shopped with the help of an electric scooter. Tr. 57-58. Plaintiff denied social activities other than spending time with his fiancé, friends, and family. Plaintiff testified that he watched TV but did not read because he could not concentrate due to his pain. Tr. 59-61, 66-68. Plaintiff could not explain notations in his medical records indicating that he fell off of a lawnmower (except to say that he was moving it out of the garage for his wife to cut the grass), and admitted that he injured his back while moving a refrigerator during the time he was claiming disability (in part) due to back pain. Tr. 69-71.

## DISCUSSION

Plaintiff alleges that: (1) the ALJ did not explain his findings regarding his residual functional capacity ("RFC") as required by SSR 96-8p; (2) the ALJ erred in failing to properly evaluate whether his condition met or equaled the Listing of Impairments ("Listings"), see 20 C.F.R. Pt. 404. Subpt. P, at § 1.04 (Disorders of the Spine); and (3) the ALJ failed to correctly assess his credibility and subjective allegations. The Commissioner contends that substantial evidence[5] supports the ALJ's

---

[5]Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

(continued...)

13

finding that Plaintiff retained the RFC to perform a range of light work and was not disabled under the Social Security Act.

A.     Listings

Plaintiff alleges that the ALJ erred in failing to find that he met or equaled the Listings at § 1.04A.  He argues that, contrary to the ALJ's finding, he presented medical evidence that his condition caused neuro-anatomic distribution of pain with the required associated signs and symptoms. Specifically, he argues that the medical records indicate neuro-anatomic distribution of pain (Tr. 968, 989, 993, 1024, 1061, 1091, 1107, 1286, and 1341), limitation of motion of the spine (Tr. 916, 969, 991), motor loss consisting of atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss (Tr. 968, 973, 976, 977, 980, 983, 986, 990, and 991) and positive straight-leg raise testing (Tr. 971, 974, 984, 987, 1108, 1217, and 1341). Plaintiff acknowledges that there are examples in his file when strength was indicated to be normal or straight-leg raise testing was negative, but alleges the ALJ erred in not acknowledging the evidence and explaining a finding that resolves the conflicting evidence.  The Commissioner contends that the ALJ reasonably found that Plaintiff's back condition did not meet or equal the Listing at § 1.04.  The Commissioner also contends that most of the records cited by Plaintiff in his brief just show that he complained to doctors about his symptoms (which were found to be not fully credible) and that many

---

[5](...continued)
Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966).  It must do more, however, than merely create a suspicion that the fact to be established exists.  Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

of the records are from immediately following a car accident and do not establish any longstanding impairment.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d); see Bowen v. Yuckert, 482 U.S. 137, 146 and n. 5 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a).  A claimant has to establish that there was a "twelve-month period...during which all of the criteria in the Listing of Impairments [were] met." DeLorme v. Sullivan, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

The Listing at § 1.04 provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

15

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04A.

Although Plaintiff has cited to various times when he had one or more of the requirements of § 1.04A, he has not shown that he met or equaled all of the Listing criteria for at least twelve months. The ALJ specifically found the medical evidence did not support a finding that Plaintiff experienced neuro-anatomic distribution of pain with limitation of the spine, motor loss, sensory or reflex loss, and positive straight-leg raise testing. Tr. 17. He specifically reviewed and discussed Plaintiff's medical records, including objective medical testing, in reaching his conclusion. See Tr. 14, 17, 23-24. As noted by the ALJ, treatment records from the relevant time period indicated that Plaintiff had full range of motion of his spine, full musculoskeletal strength, and intact sensation. Although Plaintiff points to some records indicating otherwise, many of these records refer to Plaintiff's own complaints (not the findings of Plaintiff's physicians on examination or to objective testing) and these subjective complaints were properly discounted (discussed below). Also, much of the evidence cited by Plaintiff is from shortly after Plaintiff was injured in an automobile accident and fails to show that he met or equaled all of the requirements of § 1.04A for the required length of time.

B.    RFC

Plaintiff alleges that the ALJ erred in not explaining his findings regarding Plaintiff's RFC as required by SSR 96-8p. In particular, Plaintiff argues that there is "no substantial explanation provided in the ALJ decision as to why [Plaintiff's lumbar spine problems ] would not result in some meaningful type of sitting, standing, or walking restriction." He also argues that the ALJ erred in finding that his mental impairments were not limiting. The Commissioner contends that the ALJ reasonably found that Plaintiff has the RFC for light work because no doctor (treating,

16

examining, or non-examining) opined that Plaintiff had any limitations beyond those found by the ALJ; the ALJ reasonably accommodated Plaintiff's credible back and leg limitations by limiting him to light work; and there was no evidence that Plaintiff had mental limitations that limited his ability to perform work.

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8p. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

The ALJ's determination concerning Plaintiff's RFC is supported by substantial evidence. Here, the ALJ specifically included a narrative discussion as required by SSR 96-8p. See Tr. 22-26. No treating, examining, or nonexamining physician opined that Plaintiff had any functional limitations that would reduce his RFC beyond the restrictions assessed by the ALJ. See Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)(finding that no physician opined that claimant was totally and permanently disabled supported a finding of no disability); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)(treating physician's opinion entitled to great weight). The ALJ's decision is supported by the opinions of the state agency physicians and psychologists who opined that Plaintiff could perform a range of light work. See 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2); SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an

17

individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review.").

Plaintiff alleges that the ALJ's decision exclusively discusses evidence supportive of his decision and fails to include evidence citing positive straight leg raises, radiating pain, limited range of motion, and an antalgic gait which would support a finding that he could spend most of the day on his feet performing work activity. Plaintiff argues that certain of the evidence cited by the ALJ to support his findings concerns treatment for conditions other than his back. The ALJ's determination that Plaintiff had the RFC for a limited range of light work despite his back and leg impairments is supported by substantial evidence. The ALJ reviewed the evidence of record and noted that despite Plaintiff's repeated emergency room visits, he had largely normal examinations. Tr. 21. The ALJ noted that although Plaintiff had some degeneration and joint disease in his back, most examination findings were normal and showed normal range of motion, normal extremity strength, intact sensation, and normal alignment. See Tr. 23-24. As noted above, the ALJ also reasonably relied on the opinions of the state agency physicians. These opinions are not contradicted by any other medical opinions.

The ALJ's determination that Plaintiff's mental limitations were not severe and did not limit his ability to perform work is supported by substantial evidence. The ALJ noted the evidence concerning Plaintiff's mental limitations, which primarily consisted of Plaintiff's hospitalization in January 2008 (approximately four months prior to Plaintiff's alleged onset date) for bipolar disorder, anxiety, and polysubstance dependence. After that time, however, there is no indication that Plaintiff sought any further help from any mental health care provider. Plaintiff testified that he was not seeing a psychologist, psychiatrist, or mental health care provider; he was hospitalized in January

2008; and there was "nothing else." Tr. 65. The ALJ reasonably relied on the opinion of Plaintiff's treating physician at Oaktree in July 2009 that Plaintiff did not have any mental diagnoses; was oriented; had intact thought processes and appropriate thought content; had normal mood and affect; had good attention, concentration, and memory; and did not have any work-related mental limitations. Tr. 27, 997. The ALJ also reasonably relied on the opinions of the state agency psychologists who opined Plaintiff did not have any mental limitations that affected his ability to perform work-related activities. Tr. 27, see Tr. 998, 1026.

Plaintiff points to records that he was prescribed one dose of Geodon for anxiety in November 2008 (Tr. 954) and that Dr. Ross noted Plaintiff's prior history of mental impairments, recommended that Plaintiff seek mental health treatment, and refused to prescribe Chantix (to aide in smoking cessation) because of Plaintiff's history of significant depression (Tr. 850) in support of his argument that the ALJ should have found mental limitations. There is, however, no evidence that Plaintiff had a history of mental impairments that imposed limitations on Plaintiff's ability to work for a period of not less than twelve months during the relevant time period. Plaintiff also argues that the ALJ should have found limitations from his mental limitations based on his own claims of problems with social interactions (including a short temper and problems getting along with others) and his inability to work with others. In support of this, he has cited mainly his own testimony to argue that he had problems with anger, anxiety, and concentration. The ALJ, however, noted that Plaintiff's claims of disabling mental symptoms were contradicted by his statements (in disability questionnaires) that he got along with others and with authority figures "okay" and had never been fired from a job for problems getting along with people. Tr. 26, see Tr. 204. The ALJ also noted that agency representatives reported that Plaintiff was cooperative and able to adequately engage in the

19

interview process.  Tr. 26, <u>see</u> Tr. 156, 169. Additionally, the ALJ noted (contrary to Plaintiff's argument in his brief that he cannot concentrate) that Plaintiff reported in a disability questionnaire that he can pay attention "for as long as needed," could follow written instructions "okay," played card games, and watched television.  Tr. 16, <u>see</u> Tr. 203.

        C.    <u>Credibility/Subjective Complaints</u>

Plaintiff alleges that the ALJ failed to correctly assess his credibility and subjective allegations. He argues that the ALJ relied too heavily on his limited activities of daily living and mischaracterized his emergency room visits as "largely normal examinations" as bases to dismiss his credibility. Plaintiff argues that his ongoing efforts to relieve his pain, including chiropractic treatment, physical therapy, home exercises, injections, tests such as MRIs, and other objective evidence support his credibility. Additionally, Plaintiff asserts that the ALJ failed to consider Plaintiff's persistent efforts to obtain pain relief as enhancing credibility, but instead suggested that Plaintiff engaged in drug-seeking behavior.  Plaintiff also argues that the ALJ wrongly emphasized the fact that he still smoked, rather than noting his relative success in dealing with his smoking habit. The Commissioner contends that the ALJ reasonably found that Plaintiff was not credible by reviewing all the evidence and finding that Plaintiff was able to perform a range of light work with restrictions to account for credible limitations. In particular, the Commissioner contends that Plaintiff's credibility is eroded by his engaging in repeated drug-seeking behavior, the normal examination findings by many of Plaintiff's emergency room doctors, inconsistent statements by Plaintiff concerning illicit drug use, inconsistent statements by Plaintiff concerning his daily activities, and Plaintiff's failure to follow through with recommendations that he stop smoking.

In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record.  See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994).  Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ's decision to discount Plaintiff's credibility and subjective complaints is supported by substantial evidence. The ALJ found at step one of the two-part test that Plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms. Tr. 19.  The ALJ then considered Plaintiff's subjective complaints along with the entire record in determinating Plaintiff was not fully credible, specifically finding he was not fully credible based on inconsistencies in his statements and the evidence, statements regarding drug use which were inconsistent with the record, that Plaintiff did not always follow through with medical treatment or comply with medical directives, largely normal examinations during emergency room visits, drug-seeking behavior, and evidence of claimant's activities that was contrary to claimant's statements regarding his symptoms and limitations.  Tr. 20-22.

21

The ALJ properly discounted Plaintiff's credibility based on inconsistencies in his statements. See Mickles v. Shalala, 29 F.3d at 930. As noted by the ALJ, Plaintiff testified that he did not wash dishes because he could not stand for sufficient amounts of time due to pain. In his function report, however, he indicated he washed dishes daily and did not need help to do so (even though it was very difficult to stand for even short periods of time). Tr. 200. At the hearing, Plaintiff denied he cut grass or did yard work, although he admitted backing a lawnmower out for his girlfriend. Tr. 70. April and August 2009 medical records, however, indicate that Plaintiff performed landscape work and rode a lawnmower. Tr. 842, 1096. At the hearing, Plaintiff denied performing household maintenance activities and testified that he engaged in virtually no activities other than watching television and walking to the mailbox. His function report, however, indicates more activities. See Tr. 200-202. The ALJ also found that Plaintiff's statements concerning drug use were inconsistent with the records. Tr. 21. At the hearing, Plaintiff testified that during the previous two to two and one-half years, he used marijuana twice weekly to help him sleep. He also testified that at the time of the hearing he was no longer using marijuana and specifically denied using any other illicit drugs, including methamphetamine and cocaine. Tr. 56, 69. Records from his 2008 hospitalization, however, indicated he last reported using methamphetamine in 2007, last used crack cocaine in 2005, last used various opiates including heroin in 1997, and used marijuana daily since age fourteen. Tr. 267.

The ALJ also found that medical evidence indicated Plaintiff did not always follow through with medical treatment or comply with medical directives. Tr. 21. Treatment notes from GMH in May 2009 indicate that Plaintiff was less than fully compliant with taking medications in the past. Tr. 852. The report from his September 2009 cardiac catheterization noted Plaintiff was

noncompliant with diet, lifestyle, and tobacco abuse modifications.[6] Tr. 1032. Plaintiff also indicated

at the hearing that he was not taking any medications for pain at that time.  Tr. 62.  The ALJ also

found that medical evidence from August 2009 suggested that Plaintiff engaged in drug-seeking

behavior and at times sought treatment in order to obtain specific medications rather than to address

actual symptoms and medical concerns, and refused non-morphine medications including Naproxyn

and Ultram.  Tr. 21-22, see Tr. 267, 662-663, 1020-1021, 1136-1137. A failure to follow prescribed

treatment may bring the claimant's motivation into question and may support a decision to deny

benefits.  English v. Shalala, 10 F.3d 1080, 1083-1084 (4th Cir. 1993); see also Hunter v. Sullivan,

993 F.2d 31, 36 (4th Cir. 1993); 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed

treatment without a good reason, we will not find you disabled...").

　　　　The ALJ's decision to discount Plaintiff's credibility is also supported by his activities of

daily living.  See Mastro, 270 F.3d at 179 (claimant's daily activities undermined her subjective

complaints). The ALJ found that through Plaintiff's testimony and his function report, Plaintiff

acknowledged activities which were contrary to his statements concerning his symptoms and

limitations.  Tr. 22. Plaintiff acknowledged that he drove; made coffee; independently showered and

dressed; cooked for thirty to forty-five minutes daily; prepared full meals including a meat, two

vegetables, and bread; shopped for groceries; spent time with family and friends; watched movies

and television; played with his grandchildren; went outside multiple times each day; left home alone;

and played cards. Tr. 200-202. Plaintiff indicated in a January 14, 2009 questionnaire that he

_____

　　　　[6]The Fourth Circuit there held that the Commissioner can only "deny the claimant benefits because of alcohol or tobacco abuse if [he] finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able voluntarily to stop." Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir.1984). Here, however, the ALJ did not deny benefits based on Plaintiff's tobacco abuse or his failure to quit smoking, but merely considered it as a factor in his credibility analysis.

exercised five times a week by walking (Tr. 1320), and records from Oaktree provided that Plaintiff exercised weekly, primarily by walking (Tr. 969, 990).  April 2009 notes from GMH indicated that Plaintiff did landscape work without any chest discomfort (Tr. 842), Plaintiff sought treatment in August 2009 at CMH after falling off a lawnmower (Tr. 1096), and Plaintiff went to the emergency room in April 2010 after falling out of a truck (Tr. 1364).

Plaintiff appears to request that the court reweigh his credibility and the ALJ's determinations concerning his RFC. The court is not to reweigh evidence or make credibility determinations in evaluating whether a decision is supported by substantial evidence; "[w]here conflicting evidence allows reasonable minds to differ," the court must defer to the Commissioner's decision. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005)(per curiam). The ALJ not only considered the evidence of record, but also considered Plaintiff's testimony at the hearing.  The court cannot reweigh evidence and second guess the ALJ.  See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001).

## CONCLUSION

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be **AFFIRMED**.

Joseph R. McCrorey
United States Magistrate Judge

June 13, 2013
Columbia, South Carolina